LITHUANIAN COMMERCE
CORPORATION, LTD.,
Plaintiff,

v.

SARA LEE HOSIERY, Sara Lee Hosiery
International, Sara Lee International and
Sara Lee Corporation, Defendants.

SARA LEE HOSIERY, Sara Lee Hosiery
International and Sara Lee Corporation,
Counterclaim Plaintiffs,

v.

LITHUANIAN COMMERCE COR-
PORATION LTD., Counter-
claim Defendant,

Algis Vasys and Laima Zajanckauskiene,
Third–Party Defendants.

Civil No. 96–1949.

United States District Court,
D. New Jersey.

Dec. 4, 1997.

Gregory D. Saputelli, James R. Thompson, Obermayer, Rebmann, Maxwell and Hippel, West Haddonfield, NJ, for Plaintiff/Counterclaim Defendant, Lithuanian Commerce Corporation Ltd., and Third–Party Defendants, Algis Vasys and Laima Zajanckauskiene

Diane E. Brehm, Ballard, Spahr, Andrews and Ingersoll, Camden, NJ, Carl W. Hittinger, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for Defendants/Counterclaim Plaintiffs, Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International and Sara Lee Corporation.

### OPINION

ROSEN, United States Magistrate Judge.

### I. INTRODUCTION

Presently before this court are the following motions: the motion *in limine* of Carl Hittinger, Esquire, attorney for the defendants, Sara Lee Hosiery, et al., (hereinafter "Sara Lee"), to exclude from trial the expert reports and testimony of expert witnesses of Lithuanian Commerce Corporation, Ltd., (hereinafter "LCC"), pursuant to Rule 37(c)(1), Fed.R.Civ.P. and Rule 702, Fed. R. Evid; the cross-motion of Gregory Saputelli, Esquire, attorney for the plaintiff, for an order declaring that the defendants have waived all objections to the testimony of the three Lithuanian experts whose trial depositions have already been taken, pursuant to Rule 4:14–9(f), New Jersey Civil Practice Rule; the motions *in limine* of Carl Hittinger, Esquire, attorney for the defendants, to preclude any evidence as to whether L'EGGS brand pantyhose infiltrated the Lithuanian market and to exclude the testimony and report of LCC's proposed expert, Dr. Bernard Miller; and the motions *in limine* of Gregory Saputelli, Esquire, attorney for plaintiff, to limit the scope of defendants' expert witness at trial and to limit the testimony of defendants' witnesses at trial with regard to defendants' counterclaim. After careful consideration of the parties' submissions,[1] having heard testimony on September 2, 1997 and September 25, 1997[2], and for the reasons noted below, the defendants' motion *in limine* to exclude from trial the expert reports and testimony of LCC's expert witnesses shall be ***GRANTED IN PART AND DENIED IN PART***; the plaintiff's cross-motion shall be ***DENIED***; the defendants' motion *in limine* to preclude any evidence as to whether L'EGGS brand pantyhose infiltrated the Lithuanian market shall be ***DENIED***; the defendants' motion *in limine* to exclude the testimony and report of Dr. Miller shall be ***GRANTED IN PART AND DENIED IN PART***; the plaintiff's motion *in limine* to limit the scope of defendants' expert witness at trial shall be ***DISMISSED AS MOOT***; and the plaintiff's motion to limit the testimony of defendants' witnesses at trial with regard to defendants' counterclaim shall be ***DENIED***.

### II. FACTUAL BACKGROUND

In early 1994, after LCC became an authorized distributor in the territory of Lithuania for Sara Lee hosiery, LCC began aggressively marketing and selling U.S. manufactured L'eggs brand pantyhose in Lithuania. Cross-motion at 2. LCC claims that its promotion efforts in developing new markets were significantly thwarted when Sara Lee purportedly donated 3,158,554 pairs of

---

1. At the close of oral argument, the court permitted the parties to submit supplemental memoranda in lieu of closing arguments. Both parties submitted such memoranda. However, by letter dated October 15, 1997, counsel for LCC asserted that the Affidavit of Mary A. Woodford, Sara Lee's proposed damage expert, that was submitted by Sara Lee was actually a supplemental expert report. To the extent that this affidavit contains supplemental conclusions and opinions, it was not relied upon by the court in deciding Sara Lee's motion *in limine*.

2. The hearing held on September 2 and September 25 only addressed the defendants' motion *in limine* to exclude the testimony and reports of six of the plaintiff's expert witnesses.

L'eggs brand pantyhose, tights and socks to a charitable organization—Brother to Brother International, Inc. Cross-motion at 2. LCC further claims that, at the time of the donation, Sara Lee was aware that these pantyhose were destined for Belarus, a former Soviet Union Republic. Cross-motion at 2. Belarus shares a common border with both Lithuania and Latvia and LCC alleges that these pantyhose eventually infiltrated Lithuania and detrimentally affected its market. Cross-motion at 2–3. LCC argues that consequently, retailers who had previously purchased L'eggs pantyhose from LCC ceased doing so, having found a "cheaper source" from the black market channels through which the donated pantyhose were allegedly flowing. Cross-motion at 3.

In an attempt to resolve this dispute, Sara Lee, by letter agreement, agreed to ship LCC a substantial amount of L'eggs brand pantyhose manufactured at Sara Lee's plant in Mexico. Counterclaim and Third-party Complaint. at ¶ 63. (hereinafter "Third-party Complaint.") LCC contends that Sara Lee had made express representations to LCC that the specifications of the Mexican pantyhose would be identical to the American pantyhose. Sara Lee, however, asserts that prior to the execution of the letter agreement, LCC had been sent sample boxes of each style, totaling eight pairs, of the Mexican made L'eggs pantyhose for inspection and evaluation. Third-party Complaint. at ¶ 64. The boxes containing the samples purportedly disclosed different pantyhose colors and fiber content than that previously received by LCC, but that LCC did not raise any further questions after its inspection. Motion at 7. Thereafter, approximately 500,000 pairs of pantyhose were shipped to LCC.

LCC claims that in December of 1995, it began receiving numerous consumer complaints about the mexican L'eggs pantyhose. Complaint at ¶ 41. The problems with these pantyhose allegedly became so pervasive that LCC had no alternative but to withdraw all of the Mexican-made L'eggs pantyhose from the stores of its retailers. Cross-motion at 7.

**3.** Although Sara Lee's Motion *In Limine* to exclude the testimony of LCC's proposed expert Dr. Bernard Miller was filed separately, it will be

The gravamen of LCC's suit against Sara Lee, which was filed in March of 1996, are the alleged misrepresentations that Sara Lee made to LCC with respect to the claimed differences in characteristics, specifications and quality of the Mexican-made pantyhose from the U.S. made pantyhose. *See* Complaint.

Meanwhile, Sara Lee counterclaims, that during LCC's marketing and advertising campaign, LCC, without Sara Lee's authorization or knowledge, falsely touted all L'eggs brand pantyhose as having medical or therapeutic qualities. Third-party Complaint at ¶ 32, 37, 38, 40, 43–62.

Currently at issue is the proposed expert reports and/or testimony of six of LCC's witnesses, three of whom were deposed by video-tape deposition for use at trial. Sara Lee challenges the use of these expert witnesses based on Rule 26(a), Fed.R.Civ.P. and under Rule 702, Fed.R.Evid.

## III. SARA LEE'S MOTION IN LIMINE TO EXCLUDE LCC'S EXPERTS [3]

### A. Disclosures required under Rule 26(a)

The disclosure of expert testimony is governed by Fed.R.Civ.P. 26(a)(2)(B), which states in relevant part:

Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years;

addressed in this section as the objections are similar to those lodged in the initial motion.

compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

The purpose for "requiring expert reports is 'the elimination of unfair surprise to the opposing party and the conservation of resources.'" *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J.1996) (quoting *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir.), *cert. denied*, 516 U.S. 822, 116 S.Ct. 84, 133 L.Ed.2d 42 (1995)). The requirements of this provision of the Federal Rules of Civil Procedure [4] assist the court in "making rulings limiting or restricting expert testimony[.]" *Id.* at 429 n. 9.

 Potential sanctions for violation of Fed.R.Civ.P. 26(a)(2)(B) may be severe given that "[n]othing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion." *Reed*, 165 F.R.D. at 430. In order to exclude expert testimony, the opposing party must be prejudiced. *ABB Air Preheater Inc. v. Regenerative Environmental Equipment Co.*, 167 F.R.D. 668 (D.N.J.1996). Rule 37(c)(1), Fed R. Civ. P., providing for the imposition of mandatory sanctions upon failure to comply with Rule 26, states:

A party without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Failure to comply with Rule 26 regarding expert witnesses is only harmless when "'there is no prejudice to the party entitled to disclosure.'" *Reed*, 165 F.R.D. at 430 (quoting *Nguyen v. IBP Inc.*, 162 F.R.D. 675, 680 (D.Kan.1995)).

 The applicability of the sanctions under Rule 37(c)(1) falls within the sound dis-

cretion of the trial court. *Newman v. GHS Osteopathic Inc.*, 60 F.3d 153 (3d Cir.1995). In *Reed*, the court struck the testimony of a series of expert witnesses whose reports failed to comply with the standards of Fed. R.Civ.P. 26(a)(2)(B). The proposed experts had failed to submit information regarding compensation, publication, prior testimony, documents relied on, and a sufficient basis for their testimony. *Reed*, 165 F.R.D. at 429–30. The court stated that these reports were "not sufficiently complete and in compliance with the rule so that plaintiffs would not be surprised." *Id.* at 430. In *Hagans v. Henry Weber Aircraft Inc.*, 852 F.2d 60 (3rd Cir.1988), the court upheld the exclusion of expert testimony for failure to disclose, in a timely manner, a "flight test" as a basis for expected testimony, contrary to a discovery order.

 However, the Third Circuit has noted its "aversion, absent extreme circumstances, to the exclusion of crucial evidence." *ABB Air Preheater Inc.*, 167 F.R.D. at 673; *see also In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 792–793 (3d Cir.1994) (overturning district court's decision to exclude expert testimony where prejudice was "extremely minimal"), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Indeed, exclusion of evidence is a severe sanction and is therefore often inappropriate unless the failure to disclose or supplement is in bad faith or the resultant prejudice to the opposing party cannot be cured because, for example, use of the evidence is "imminent or in progress." *ABB Air Preheater, Inc.*, 167 F.R.D. at 671–72. *See also Asia Strategic Investment Alliances Ltd. v. General Electric Capital Services, Inc.*, No. 95–2479–GTV 1997 WL 122568, at *6 (D.Kan. March 11, 1997) for a similar discussion on the hesitance of a court to exclude evidence based upon a Rule 26 violation.

### B. *Daubert Analysis*

 Rule 702, Fed.R.Evid., governing expert testimony, provides that:

---

4. The requirements include: 1) a complete statement of all opinions to be expressed; 2) data and information considered by the expert; 3) any exhibits to be used; 4) qualifications of the expert, including publications for the past ten years; 5) compensation; and 6) a list of cases in which the expert has testified over the past four years. *Reed*, 165·F.R.D. at 428–29.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience; training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 702 has three main components. First, the proffered expert witness must in fact be an expert. *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 741. This requirement is to be construed liberally. *Id.* The Third Circuit, in interpreting who qualifies as an "expert," concluded that a "broad range of knowledge, skills, and training qualify an expert as such" and that the imposition of overly rigorous requirements of expertise is eschewed. *Id.*

■ With respect to the second and third components, the United States Supreme Court, in the seminal case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), determined that Rule 702 mandated that expert testimony must be both reliable and relevant in order to be admissible. *Id.* at 589, 113 S.Ct. at 2794–95. Evidentiary reliability requires that the expert's testimony pertain to "scientific knowledge."[5] *Id.* at 590, 113 S.Ct. at 2795. "Scientific" describes methods and procedures that are grounded in science. *Id.* The term "knowledge," which is "more than subjective belief or unsupported speculation," is "'any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id.* (citing Webster's Third New International Dictionary 1252 (1986)). Rule 702's requirement that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue"

goes primarily to relevance. *Id.* at 591, 113 S.Ct. at 2795. In other words, the expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985).

■ The court has the obligation to make a preliminary evaluation of expert testimony under Rule 104(a).[6] In that sense, the court must initially determine whether expert testimony is 1) based upon scientific knowledge that 2) will assist the trier of fact to understand or determine a fact in issue. To that end, the trial judge must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. at 2796.

■ The Court delineated several factors to consider in determining whether to admit expert testimony:

(1) whether the theory or technique in question can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance.

*Id.* at 593–95, 113 S.Ct. at 2796–98. This inquiry is a flexible one; thus, these factors are intended to constitute general guidelines rather than serve as a definitive checklist. *Id.* Indeed, the Third Circuit suggested that in addition to the above, any other relevant factors ought to be considered[7] including:

---

**5.** While, the Court recognized that Rule 702 also applies to "technical or other specialized knowledge," it limited its discussion to scientific evidence as that was the nature of the expertise being questioned. *Daubert*, 509 U.S. at 590, n. 8, 113 S.Ct. at 2795, n. 8.

**6.** Rule 104(a), in pertinent part, provides: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, ...."

**7.** In *Daubert*, the Supreme Court also recognized that Rule 703, which "provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject'" ought also be considered. *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797–98.

Additionally, the court should be mindful of Rule 706 which allows the court at its discretion to obtain the aid of an expert of its own choosing. *Id.*

Lastly, "Rule 403 permits the exclusion of relevant evidence if the probative value is substantially outweighed by the danger of unfair preju-

the relationship of the technique at issue to methods which have been established to be reliable; the qualifications of the expert witness testifying based on the methodology; and the non-judicial uses to which the method has been put. *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 742 n. 8. These factors shall be considered for each of the plaintiff's challenged witnesses *seriatim*.

## C. ANALYSIS

This court shall analyze each challenged expert report and opinion in accordance with the law set forth above. However, it should be noted that many of the problems brought forth by this motion *in limine* could have been avoided but for the failure of plaintiff's counsel to properly advised certain proposed expert witnesses of their obligations under Rule 26 and *Daubert*. The court was advised during the last hearing on this motion that the expert witnesses retained from Lithuania were never informed that they were being retained as experts in anticipation of litigation. *See also* Skleriute Deposition at 26–27. Indeed, counsel advised the court that he never spoke directly to these witnesses when they were retained; rather, he relied on his client to contact and retain them. *See* Transcript of September 25, 1997 at 70–73. Had those experts been properly advised of their obligations, many of the problems, certainly those regarding missing documentation and other information supporting the expert reports and opinions, may have never arisen. This failure on the part of plaintiff's counsel, though not dispositive in regard to the *in limine* motion, has created serious Rule 26 and other concerns regarding the viability of those witnesses. As such, plaintiff's counsel should be aware of the added costs to his client and the inconvenience to both the parties and the court caused by his failure to properly prepare his witnesses.

As a final note, the experts challenged by Sara Lee are challenged under Rule 26 and/or *Daubert*. However, given the posture of this case, the court is compelled to determine whether each challenged expert meets the requirements imposed by Rule 26 and *Daubert*. This is notwithstanding the fact

that each expert may not be challenged on both grounds.

### Charles J. Cummiskey

Charles J. Cummiskey, LCC's proposed damage expert, has prepared a twenty-two page report setting forth his opinion as to LCC's damages arising from Sara Lee's alleged wrongful conduct. Motion at Exhibit "T". Mr. Cummiskey has attached fifteen exhibits and twelve appendices to this report.

### 1. Background and area of expertise

Mr. Cummiskey is a licensed certified public accountant with at least twelve years of experience. Cummiskey Curriculum Vitae (hereinafter, "CV") at 1. Mr. Cummiskey was an agent with the Internal Revenue Service from 1972 until 1984, where he held the positions of Acting Group Manager, Criminal Investigator and Revenue Officer. Cummiskey CV at 1–2. Mr. Cummiskey has received a Bachelor of Science degree in Business Administration, a Master of Business Administration degree and a Master of Science degree in Taxation and is a member of both the American and Pennsylvania Institutes of Certified Public Accountants. Cummiskey CV at 2.

### 2. Tests performed

Mr. Cummiskey was retained to "calculate damages sustained by LCC as a result of the business it lost following Sara Lee's donation of pantyhose to Russia, and Sara Lee's subsequent provision to LCC of defective L'eggs pantyhose . . . ." Cummiskey Report at 1. Although he did not perform any tests, Mr. Cummiskey projected damages for fifteen and twenty year periods for Estonia, for sixteen and twenty-one year periods for Latvia and for seventeen and twenty-two year periods for Lithuania. Cummiskey Report at 11. In order to complete these calculations, Mr. Cummiskey assumed that LCC had a 10% market share in Estonia, Latvia and Lithuania and that the market share in Lithuania would increase by 1% per year. Cummiskey Report at 11. Also factored into the calculations was the estimation, based upon a report from the National Association

dice, confusion of the issues, or misleading the

jury . . . ." *Id.*

of Hosiery Manufacturers regarding women in the United States, that Baltic women consume ten pair of pantyhose per year. Cummiskey Report at 13.

### 3. Data relied upon

In compiling this report, Mr. Cummiskey reviewed the following documents:

- Sara Lee Annual Reports for the Years 1993–1995
- LCC Corporate Income Tax Returns for the Years 1993–1995
- Invoices and Purchase Orders for the Purchase of Product from Sara Lee by LCC
- Demographic Information for the Countries Estonia, Latvia and Lithuania
- National Hosiery Manufacturers Association Report for 1995
- Deposition of Algis Vasys
- Transcript of Telephone Conversation between Peter Hellebush of Sara Lee and Algis Vasys
- Deposition of Herve Roche
- Financial Records of LCC for the Years 1994–996
- Sara Lee Memos from Vereen Mizelle
- Report of Analysis by Philadelphia College of Textiles & Science
- Deposition of Vereen Mizelle
- Deposition of Gundega Rudzite

Cummiskey Report at 1, Appendix 1.

### 4. Conclusion

#### a. Rule 26

■ In its entirety, Mr. Cummiskey's report is acceptable under Rule 26(a). It contains a clear statement of his opinions and the basis and reasoning for such conclusions. The data and information relied on for his opinions are provided in the fifteen exhibits and twelve appendices attached to his expert report. These documents may also comprise the list of exhibits required by Rule 26(a), but are not identified as such. Finally, Mr. Cummiskey establishes his qualifications through a Curriculum Vitae.

LCC has not provided a list of Mr. Cummiskey's publications for the past ten years, the amount of compensation he is receiving for his testimony, or a list of cases in which he has been a witness over the past four years, stating merely that he has testified in other cases but not naming them. These are all requirements under Rule 26(a). However, Sara Lee does not challenge Mr. Cummiskey's testimony on these grounds. Moreover, in light of the goal of preventing surprise, preventing prejudice that results from guessing at how and why an opinion was reached, and the Third Circuit's reluctance to exclude witnesses, Mr. Cummiskey's testimony shall not be barred for these violations of Rule 26(a). *Reed*, 165 F.R.D. at 430; *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 792–93. Mr. Cummiskey shall be required to provide the missing information within twenty days. Fed.R.Civ.P. 37 (allowing the court to fashion remedies for violations of R. 26(a)).

#### b. Daubert

■ In *United States v. Velasquez*, 64 F.3d 844, 850 (3d Cir.1995), the Third Circuit recognized that some courts, including the Second Circuit, have held that the *Daubert* tests are too stringent to apply when considering the admission of expert testimony by accountants. *See Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir.1993). However, the Third Circuit has neither implicitly nor explicitly adopted such a ruling. In *Velasquez*, the court declined to follow the Second Circuit and "in an exercise of caution," reviewed a handwriting expert's proposed testimony under the *Daubert* analysis. 64 F.3d at 850. Further, although the expert testimony before the Supreme Court in *Daubert* was of a scientific nature, the Court did not limit its analysis to the scientific context. Rather, it recognized that Rule 702 does apply to "technical, or other specialized knowledge." *Daubert*, 509 U.S. at 590 at n. 8, 113 S.Ct. at 2795 at n. 8. Accordingly, this court will examine the admission of Mr. Cummiskey's report and testimony under the *Daubert* factors. *See also Tyus v. Urban Search Management. et al.*, 102 F.3d 256, 263 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1997).

Sara Lee's first argument against the testimony and report of Mr. Cummiskey is that he lacks the requisite academic and/or practical knowledge to calculate LCC's alleged business damages and lost future profits. Motion at 52–55. Admittedly, Mr. Cummiskey has no specific expertise in calculating foreign market share, consumer preference, consumption rates, or market competition. *See* Cummiskey CV. However, the requirements of qualifying as an expert are flexible and rigid application of such has been eschewed. *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797; *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d at 741. Thus, expert testimony may not be excluded merely because an expert does not possess the background which the court deems most appropriate. *Waldorf v. Shuta,* 916 F.Supp. 423, 430 (D.N.J.1996) (citations omitted) (admitting an expert despite "thin" formal credentials). Accordingly, as noted by LCC, Mr. Cummiskey need not be the best qualified witness with respect to damages in order to qualify as an expert. It is sufficient that he is generally qualified in "matters of business, finance, and economics." Opposition at 2; *see In re Paoli Railroad Yard PCB Litigation,* 35 F.3d at 741. Moreover, the fact that Mr. Cummiskey does litigation support work does not disqualify him as an expert. Litigants would have quite a difficult time retaining an admissible expert for litigation purposes if this were true.

Sara Lee's second argument is that the data underlying Mr. Cummiskey's opinions is unreliable. Motion at 55–66. For example, Mr. Cummiskey assumes that LCC has 10% of the market share in Estonia, Latvia and Lithuania. Cummiskey Report at 11. However, this assumption is not predicated upon a numerical analysis of the respective market share of LCC and its competitors in those countries. Rather, Mr. Cummiskey supports his assumption with evidence of Sara Lee's market leadership (in hosiery) in the United States, France, Germany and the United Kingdom, the success of L'eggs pantyhose in both the United States and "the world", the manufacturing and distribution network attributable to Sara Lee, and the absence of competition in the hosiery market in both Eastern and Western European countries when LCC introduced L'eggs into Lithuania. Cummiskey Report at 11–12. Equally unsupported are the assumptions regarding the length of LCC's participation in each market and that LCC's market share in Lithuania will increase at a rate of 1% each year. Finally, Mr. Cummiskey's assertion that Baltic women consume approximately ten pair of pantyhose per year is not based upon any survey of Baltic women. Cummiskey Report at 13. Rather, it is based on a survey of American women and an LCC management conclusion that Baltic women consume less pantyhose per year than women in the United States. Cummiskey Report at 13.

Nevertheless, these types of deficiencies are not of the kind that mandate exclusion of Mr. Cummiskey's report and testimony. The evidence submitted by both parties reveals that determining future profits is inherently unpredictable. Further, there appears to be no standardized method for making these calculations. While Sara Lee contends that Mr. Cummiskey's methodology is suspect, it cites nothing that illustrates the "proper" methodology. *See* Motion at 50–66.[8] Indeed, the focus of Sara Lee's challenge is not aimed at the principles or the methodology used by Mr. Cummiskey in actually calculating damages; rather, the crux of Sara Lee's objection is that Mr. Cummiskey's results will unfairly prejudice, confuse, or mislead the jury. *See Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). In that regard, Mr. Cummiskey sufficiently sets forth the basis for his opinion, the methodology employed to reach those opinions, and the results of his calculations. *See* Cummiskey Expert Report at 8–10, 10–17. Consequently, the report of Mr. Cummiskey shall not be stricken on that basis.

---

8. In its brief, Sara Lee suggests some additional factors that may be included in the calculation of future profits. However, no authority is cited to suggest that these are anything more than potential factors. Motion at 52.

However, Sara Lee contends that the data and information upon which Mr. Cummiskey's conclusions are based are "unsupported assumptions, baseless speculation, incomplete or inaccurate data, and erroneous and self-serving presentations." Motion at 55. For example, Mr. Cummiskey projected damages for LCC for a twenty-one year period. He determined the length of the projected damages period based on the length Sara Lee's relationship with other distributors in the past. Cummiskey Report at 11. Sara Lee argues that it is inaccurate to project LCC's damages with respect to the Lithuanian market over a period of twenty-two years based solely on the fact that a relationship between other distributors and Sara Lee existed for longer than twenty years. Motion at 57. In attacking Mr. Cummiskey's reliance on this information, Sara Lee notes that one of these distributors does not operate in a foreign market, that it operates in a market with different consumer preferences, and that it faces no issues concerning tax, tariffs, and other importation restrictions and barriers, as are present in the Baltics. Motion at 57. In response, LCC surmises that because its obligations as a distributor exceeded normal levels of performance of other distributors, there was a strong possibility that LCC would have remained a Sara Lee distributor for a significant period of time. Opposition at 5–6.

While it is true that Rule 702 requires that expert testimony be supported by good grounds based on what is known, the calculation of future loss profit is, by its nature, somewhat uncertain and unpredictable. *See Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."). Thus, due to its very nature, the calculation of lost profit based on what reasonably related information is available may constitute good ground for the basis of expert testimony notwithstanding that the data used may not be ideal. The court has had the opportunity to hear the testimony of both Mr. Cummiskey and Sara Lee's damage expert. The court is confident that any perceived defects in Mr. Cummiskey's analysis, underlying data and assumptions, and conclusions are capable of being adequately addressed by Sara Lee's damage expert. *See Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. In order to err on the side of caution by not excluding what may be testimony helpful to the trier of fact, the broad construction of the admissibility of relevant evidence under Rule 401, Fed. R.Evid., and in light of the measures available, at trial, i.e. Sara Lee's opportunity to cross-examine the expert, Mr. Cummiskey's testimony as an expert shall be permitted. *See Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. Consequently, Mr. Cummiskey's report is deemed "shaky, but admissible evidence" which will not serve to mislead or confuse the jury. *See id.*

### *Dr. Joseph Zimmerman*

Dr. Joseph Zimmerman, LCC's proposed expert regarding the differences between nylon 6 and nylon 66, rendered his opinion in a two page letter, dated January 11, 1997 to Mr. Algis Vasys, President of LCC, and in a three page letter, dated May 29, 1997, also directed to Mr. Vasys. Cross–Motion at Exhibit "K". There are no exhibits or attachments to either letter.

### 1. Background and area of expertise

Dr. Zimmerman has an extensive background in textiles.

He received a Bachelor of Science degree in Chemistry, a Masters degree in Physical Chemistry and a Doctorate degree in Physical Chemistry. Zimmerman CV at 1. Dr. Zimmerman is currently a private consultant in polymers and fibers and previously worked at E.I. du Pont de Nemours and Co. in the Textile Fibers Department. Zimmerman CV at 1–2. Dr. Zimmerman has conducted considerable research in the area of textiles, has written a substantial number of articles, is affiliated with several professional organizations, and holds a number of patents. Zimmerman CV at 1–3.

### 2. Tests performed

Dr. Zimmerman proposes to opine "on the

use of nylon 6 vs. nylon 66 in hosiery."[9] However, Dr. Zimmerman does not explain any methodology or test procedures performed in reaching this opinion. His reports allude to a number of tests performed, a description of which has not been provided. LCC advances that Dr. Zimmerman is basing his conclusions and opinions on his prior experience with the two types of nylon. Opposition at 12–14.

### 3. Data relied upon

Dr. Zimmerman does not set forth the data he relied upon or analyzed in forming this opinion.

### 4. Conclusion

Sara Lee objects to the fact that Dr. Zimmerman articulates a legal conclusion in his report, as well as the fact that Dr. Zimmerman does not detail any of the research or data underlying his conclusions. Motion at 41–42. Sara Lee further argues that Dr. Zimmerman's second report, the letter dated May 29, 1997, was served upon them after the deadline set by this court for expert reports. Motion at 43. LCC, in response, asserts that Dr. Zimmerman does not set forth any legal conclusions and that Dr. Zimmerman's opinion is supported by "his decades of experience in polymers and fibers, along with his credentials as a foremost expert in the area." Opposition at 12–14. LCC also contends that the May 29, 1997 letter was timely produced pursuant to an extension granted by the court. Opposition at 14.

Sara Lee's objection to the legal conclusion propounded by Dr. Zimmerman shall be addressed first. Dr. Zimmerman states:

> In the first place, it is my opinion that replacement of nylon 66 with nylon 6 in a product without informing the customer of *this change is poor commercial practice bordering on fraud.* Even smaller changes within a given polymer composition (e.g. molecular weight or polymer ad-

ditives) usually require informing the customer of such changes.

Zimmerman report dated 1/11/97 at 1 (emphasis added). LCC concludes that, because this statement is not characterized as a legal conclusion, it does not qualify as such. Opposition at 14. Further, LCC claims that this opinion will have no misleading or confusing effect on the jury. Opposition at 14.

■ Sara Lee asserts that the above quoted statement is a legal conclusion that Dr. Zimmerman is not qualified to make. Motion at 41–42. While Dr. Zimmerman may be eminently qualified as an expert in textiles, he admittedly has no background in commercial practices or commercial law. A cursory review of Dr. Zimmerman's CV establishes that he has not met any of the requirements of Rule 702, Fed.R.Evid. to support an opinion rendered outside the field of textiles. Thus, the conclusion that the practice of substituting nylon 6 for nylon 66 amounts to "fraud" is not supported in light of Dr. Zimmerman's lack of expertise in these areas. This is true even though the qualification of a witness as an expert should be construed liberally. *See In re Paoli Railroad Yard PCB Litigation,* 35 F.3d at 741. Consequently, this portion of Dr. Zimmerman's report shall be stricken. He shall be barred from making such an assertion at trial.

### a. Rule 26

In addition to the above objection, the defendants raise objections under Rule 26 and *Daubert.* Rule 26 provides that an expert report shall contain "the data or other information considered by the witness in forming the opinions[.]" Rule 26(a)(2)(B). Although Dr. Zimmerman alludes to such data and experiments performed, he does not catalog the data, nor does he describe the tests performed. For example, Dr. Zimmerman makes the following assessment: "The tendency of nylon 6 to have a higher shrinkage could, in addition to reducing modulus further, cause a change in the configuration

---

**9.** Nylon 66 is the fiber used in manufacturing L'eggs pantyhose in America and nylon 6 is the fiber used in manufacturing L'eggs pantyhose in Mexico. The plaintiff alleges that the difference between these two fibers is crucial to the quality and wearability of pantyhose. *See* Opposition at 13–14.

of the blended elastomeric fibers and the stresses they develop as the hose are stretched." Zimmerman Report dated 1/11/97 at 2. However, Dr. Zimmerman does not detail the methodology employed by him in arriving at this conclusion, nor does he provide the underlying data.

■ While Dr. Zimmerman's conclusion that nylon 6 has a higher shrinkage rate than nylon 66 may come from his years of experience and past tests performed, the reasons for this conclusion and the facts upon which it is based should have been explained. Moreover, LCC admits that Dr. Zimmerman has not provided such information and instead claims that Dr. Zimmerman's years of experience provide sufficient support for the conclusions rendered in his reports. Opposition at 12–13. Thus, there is no basis for anyone, including the jury, to comprehend how exactly Dr. Zimmerman arrived as his opinion. As stated in *Reed,* guessing at how and why an expert reached his conclusions causes great prejudice. 165 F.R.D. at 430. Further, a decision to exclude an expert report for failure to comply with Rule 26 is within the discretion of the trial court. *Newman,* 60 F.3d at 156.

In this case, there is a great potential for prejudice to Sara Lee by allowing Dr. Zimmerman's report to serve as an expert report. It is almost impossible for a lay person, without the benefit of Dr. Zimmerman's education and experience, to evaluate Dr. Zimmerman's opinion and conclusions without knowing how he arrived at those conclusions. This in no way suggests that Dr. Zimmerman's conclusions are incorrect or inaccurate. Nor does the court suggest that Dr. Zimmerman is not qualified under Rule 702, Fed.R.Evid., to serve as an expert on this issue. Rather, it is merely a finding that his reports are insufficient to serve as an expert report under Rule 26, Fed.R.Civ.P. Thus, the reports of Dr. Zimmerman shall not be introduced at trial, nor shall he be permitted to testify.

### b. *Daubert*

■ For similar reasons, Dr. Zimmerman's report is inadmissible because it does not comport with the strictures of *Daubert.*

Although Dr. Zimmerman's scientific conclusions may be relevant to the matters at issue, Sara Lee argues that Dr. Zimmerman does not provide any basis for his conclusions and opinions. LCC contends that his experience in this area is the basis for his conclusions. Opposition at 12–14. However, although *Daubert* recognizes that an expert, unlike an ordinary witness, may offer opinions not based on first-hand knowledge or observation, it does assume that the expert's opinion "will have a *reliable basis* in the knowledge and experience of his discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796 (emphasis added). Dr. Zimmerman's report fails to identify what that "reliable basis" is.

■ Further, a determination of whether expert testimony is admissible under the *Daubert* analysis includes a "preliminary assessment of the ... reasoning or methodology underlying the testimony." *Id.* at 592–93, 113 S.Ct. at 2796. Dr. Zimmerman does not provide his methodology or reasoning for this court to assess, for Sara Lee to challenge, or for the jury to evaluate. *See Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.1997). The "falsifiability, or refutability, or testability" of a theory, as contemplated in *Daubert,* cannot be examined without knowing the basis of the hypotheses or opinions. *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796–97 (citations omitted). Without data to support the conclusions reached by Dr. Zimmerman, it is difficult to assess the "known or potential rate of error," whether there is a standard for evaluation, or whether the methodology is generally accepted. Additionally, the potential for expert testimony to mislead the jury is greater "where the jury is not presented with the data on which the expert relies, but must instead accept the expert's assertions as to the accuracy of his conclusions." *Downing,* 753 F.2d at 1239.

■ While it may be true that Dr. Zimmerman certainly appears qualified to testify in the field of nylons and polymers, his testimony may not be permitted solely on that basis. Otherwise, a proposed witness must be just a qualified expert in the area in which he or she is being offered as an expert, *In re*

*Paoli Railroad Yard PCB Litigation,* 35 F.3d at 741–42, and no more, thus rendering the requirements of *Daubert* meaningless. Accordingly, despite the Third Circuit's reluctance to disqualify important witnesses, *Reed,* 165 F.R.D. at 430; *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d at 792–93, Dr. Zimmerman's report does not provide the minimal threshold of information required to permit his expert testimony. Likewise, his report shall not be introduced at trial.

### Gintaras Pukas

Gintaras Pukas, a Lithuanian attorney, is LCC's proposed expert regarding Lithuanian law. Mr. Pukas' report is incorporated in a nine page letter report with fourteen exhibits attached thereto. Motion at Exhibit "O". The report is dated June 12, 1997. Mr. Pukas renders an opinion on exemptions from the value added tax and whether LCC violated any Lithuanian laws or regulations with regard to its advertising campaign.

#### 1. Background and area of expertise

Mr. Pukas is an attorney duly authorized and licensed to practice law in Lithuania. Pukas Report at 1. Mr. Pukas received his law degree in 1974 and became a member of the Bar of Barristers of the Lithuanian Republic at that time. Pukas CV, attached to Opposition as Exhibit "K" (hereinafter, "Pukas CV") at 1. Mr. Pukas was a partner in two firms in Lithuania before opening his own practice in 1993. Pukas CV at 1. Mr. Pukas' practice largely involves "commercial and business law related matters." Pukas CV at 1–2.

#### 2. Research conducted

Mr. Pukas made a number of inquiries and conducted research in order to arrive at his conclusions. He first analyzed the law in Lithuania regarding the goods and services that are exempt from the value added tax (hereinafter, "VAT"). Pukas Report at 1–3. Mr. Pukas inquired of the New Health Products Evaluation Commission to determine how stockings became exempt from the VAT. Pukas Report at 2. He sent letters of inqui-

ry to the Ministry of Health Protection and to the State Quality Inspection Agency to determine whether LCC's advertisements conformed with existing Lithuania law. Pukas Report at 3–4, 5. An inquiry was also made to the Ministry of Finance as to whether LCC violated any Lithuanian laws, regulations or procedures by importing L'eggs pantyhose from the United States and to the State Competition and Consumer Rights Protection Agency as to the procedures used to investigate customer complaints. Pukas Report at 6–7. Finally, Mr. Pukas researched the issue of whether or not Dr. Eduardas Antanas Kelbauskas [10], LCC's proposed medical expert, was legally permitted to disclose patient records in support of his expert report regarding the use of pantyhose for patients with varicose veins. Pukas Report at 7–9.

#### 3. Data relied upon

In 1995, Lithuania included "[s]tockings for those suffering from varicose vein expansion" as a good not subject to the VAT. Pukas Report at 2. Mr. Pukas stated that he conducted "additional research concerning on what basis the New Health Products Evaluation Commission" decided that such stocking are exempt from the VAT. Pukas Report at 2. Mr. Pukas concluded that "the [d]ecision was adopted relying on the Certificate of Quality issued on August 1, 1995 by manufacturer, Sara Lee Hosiery, and signed by Vereen Mizelle." Pukas Report at 2. Mr. Pukas further stated that "[t]his directive applies only to those pantyhose, whose quality meets that described in the Certificate of Quality, issued by the manufacturer, Sara Lee Hosiery." Finally, Mr. Pukas determined that all pantyhose were evaluated separately and were not exempt from the VAT unless the standards for VAT exemption were met. Pukas Report at 2–3. Both conclusions were based upon a letter Mr. Pukas received from the Ministry of Health Protection which is,attached to the report as Exhibit "C". Pukas Report at 4.

Mr. Pukas submitted samples of LCC's advertising materials to the Ministry of

10. *See, infra,* for an analysis of Dr. Kelbauskas' report.

Health and inquired whether those advertisements violated any laws or regulations. Pukas Report at 3–4. Mr. Pukas concludes that LCC's advertisements did not violate any Lithuanian laws based on the response from the Ministry stating the same. Pukas Report at 4. He further concluded that the advertisements, with respect to the claim of possible health benefits of the pantyhose, were not fraudulent or deceptive based on the State Quality Inspection Agency's assessment of those materials. Pukas Report at 5.

With regard to whether LCC violated Lithuania law by representing that the pantyhose were medically beneficial in order to avoid the VAT and other tariffs, Mr. Pukas followed the same course of action. He requested an opinion from the Ministry of Finance (attached as Exhibit "H" to his report) and then relied that opinion (Exhibit "H") as the sole basis for his own. Pukas Report at 6. Mr. Pukas also reports that the State Competition and Consumer Rights Protection Agency does not necessarily record every consumer complaint. Pukas Report at 7.

Finally, Mr. Pukas renders an opinion as to the non-availability of the patient records underlying Dr. Kelbauskas' expert report. Pukas Report at 7–9. Mr. Pukas provided a copy of the statute (attached as Exhibit "K" to his report) that deems all patient records to be confidential and not subject to disclosure to a third-party without the express written consent of the patient. Pukas Report at 8. Upon further inquiry, Mr. Pukas determined that Dr. Kelbauskas did not have control of the necessary records, nor would the Chief of the Third Clinical Hospital of Kaunas comply with a request to produce those documents. Pukas Report at 9.

### 4. Conclusions

#### a. Rule 26

 Although it does not appear that Sara Lee is objecting to Mr. Pukas' report and testimony under Rule 26, analysis under the rule is still necessary. Putting aside Sara Lee's objections to the timeliness of Mr. Pukas' report, it appears that the report satisfies the requirements of Rule 26. Mr. Pukas sets forth the reasons for his opinions

and includes the underlying data that support those opinions. His CV was apparently produced to Sara Lee on December 4, 1996 and marked as an exhibit at three depositions. Opposition at Exhibit "K". Mr. Pukas has not listed any publications that he has authored, nor has he disclosed other cases in which he has testified. Finally, Mr. Pukas has not disclosed the compensation he will receive for his testimony. Nevertheless, these omissions are minor and capable of being cured without substantial prejudice to Sara Lee, and are, therefore, harmless. *See Reed*, 165 F.R.D. at 430. This is true since none of the omissions go to the substance of Mr. Pukas' report and do not require Sara Lee to guess as to how Mr. Pukas reached his conclusions. *Id.*

However, Sara Lee also challenges the timeliness of Mr. Pukas' report. Motion at 46. Indeed, Sara Lee claims that Mr. Pukas was not identified as an expert witness until the submission of the parties Joint Final Pretrial Order on June 18, 1997. Motion at 46. Although LCC contends that it produced the CV of Mr. Pukas in December 1996, it does not deny that it first identified Mr. Pukas as an expert in the Joint Final Pre-Trial Order and that Mr. Pukas' report was not submitted until June 18, just two days prior to this court's deadline for expert depositions. *See* Opposition at 14–15. LCC claims that Sara Lee cannot object to not having the opportunity to depose Mr. Pukas because Sara Lee has never requested the opportunity to depose him. Opposition at 15. Moreover, LCC claims that it will produce Mr. Pukas for a deposition whenever Sara Lee intends to depose him. Opposition at 15. Although the court declines to strike the report of Mr. Pukas based on Rule 26 violations, the conclusion reached below obviates the need for Sara Lee to take the deposition of Mr. Pukas.

#### b. *Daubert*

Sara Lee also objects to the report of Mr. Pukas by characterizing his opinions as impermissible legal conclusions. Motion at 47–48. Sara Lee asserts that the proper use of this report is pursuant to Rule 44.1, Fed. R.Civ.P., to assist the court in a determina-

tion of foreign law. Motion at 47–48. Further, Sara Lee contends that the legal conclusions given by Mr. Pukas are unsupported by "reliable evidence." Motion at 48–49. Finally, Sara Lee objects to LCC using Mr. Pukas as a means to authenticate certain documents from Lithuanian government agencies. Motion at 49.

LCC responds that Mr. Pukas' report is "highly relevant to the determination of foreign law" and that exclusion of his report "would deprive the Court of highly probative information on the legal consequences of LCC's importation of the Mexican L'eggs pantyhose into Lithuania." Opposition at 15. Apparently, LCC concedes that it is offering this report under Rule 44.1, Fed.R.Civ.P. Opposition at 15. However, what LCC apparently does not recognize is that use of an expert report to assist the court in its determination of foreign law is entirely different from use of an expert report, pursuant to Rule 702, Fed.R.Evid., to aid the jury in determining the facts.

■ Essentially, instead of analyzing the data and drawing specific conclusions therefrom, Mr. Pukas merely restates the results of his inquiries. Under *Daubert,* the court is required to examine certain factors to decide whether to admit certain expert testimony. 509 U.S. at 593–95, 113 S.Ct. at 2796–98. Implicit in the *Daubert* analysis is that the expert in question performed some test or technique in reaching his or her conclusion. *Id.* That is simply not the case here. Instead of analyzing the applicable Lithuanian law and then analyzing LCC's advertisements or business practices in light of the law, Mr. Pukas requested that a governmental agency conduct that analysis for him. Thus, Mr. Pukas received what are essentially advisory, hearsay opinions from various Lithuanian government officials and incorporated those opinions into his report. This will not assist the jury in making any factual determinations, as there is no analysis set forth in the report. *See Daubert,* 509 U.S. at 591, 113 S.Ct. at 2795–96. Allowing this report to go before a jury will result in a misappropriation of the court's function in

determining foreign law. *See* Rule 44.1, Fed. R.Civ.P. Further, this report will subvert the jury's function in that it is the responsibility of the jury, not Mr. Pukas or the Lithuanian government, to determine what the facts are in light of the applicable law. For those reasons, Mr. Pukas' report shall not be admitted into evidence at trial and he shall be barred from testifying before the jury.

■ However, the plaintiff is not precluded from presenting this report to the trial judge, in accordance with Rule 44.1, Fed. R.Civ.P., to assist him on the issue of foreign law. Rule 44.1 states that:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Whether or not Mr. Pukas' report is used to determining any issues of foreign law is a decision to be made by the trial court. In so ruling, the court makes no judgment as to the weight, if any, the trial judge may give to this report under Rule 44.1, Fed.R.Civ.P.

### Dr. Elona Skleriute

Dr. Elona Skleriute is LCC's proposed expert on the quality of the Mexican pantyhose as compared with the quality of the American pantyhose. She produced a report which is approximately twelve pages and includes two charts summarizing her experiments. Cross–Motion at Exhibit "T". Dr. Skleriute concludes that the pantyhose manufactured in the United States are of a higher quality than those manufactured in Mexico.

### 1. Background and area of expertise

Dr. Skleriute's qualifications were addressed during her trial deposition held on February 4, 1997.[11] Cross-motion at Exhibit

---

11. Dr. Skleriute's CV is attached as Exhibit "E" to LCC's supplemental submission on its cross- motion, dated October 9, 1997 (hereinafter, "Skleriute CV").

"T" (hereinafter "Skleriute Deposition"). Dr. Skleriute graduated from the Kaunas Polytechnic Institute in 1961 with a degree of engineer technologist. Skleriute Deposition at 7. She received a doctoral degree in 1983. Skleriute Deposition at 12. She wrote a dissertation entitled "Study and Prognosis about the Conditions of the Formation for Elastic Materials." Skleriute Deposition at 12–13. In 1988, Dr. Skleriute received the degree of senior research fellow. Skleriute CV. It is not clear whether Dr. Skleriute authored any further publications, nor does she state whether she has testified in any other legal proceedings as an expert.

Dr. Skleriute began working at the Lithuania Textile Institute in 1962 as a scientific assistant, where her work consisted mostly of wear testing. Skleriute Deposition at 8–10. She became a senior research fellow after one year at the Lithuania Textile Institute. Skleriute Deposition at 10. In 1984, Dr. Skleriute became the head of the textile material quality section. Skleriute Deposition at 11. Her responsibilities in that position included documenting that the garment materials were satisfactory (up to standard) and managing testing of the materials. Skleriute Deposition at 11–12. Essentially, Dr. Skleriute was in charge of quality control for the Institute.[12] Skleriute Deposition at 15–16. Currently, Dr. Skleriute is the head of the textile garments testing laboratory where she mainly oversees as well as performs tests on various materials, including pantyhose. Skleriute Deposition at 16–17.

### 3. Tests performed

Dr. Skleriute was given ninety-nine pair of L'eggs pantyhose manufactured in Mexico and twenty-four pair of L'eggs pantyhose manufactured in the United States. Skleriute Deposition at 28–29. Dr. Skleriute reports that she conducted several tests comparing the L'eggs pantyhose made in the United States and those made in Mexico. Skleriute Report at 1. Dr. Skleriute summarized her research as follows:

> Examination was performed, after providing experimental wearing, analyzing structural characteristics of ladies tights, and executing laboratory testing. Deformative characteristics of tights were evaluated taking into account characteristics of resiliency, elasticity and rigidness modulus. Results were obtained on the basis of stretching [sic] curves and five cycles of stretching-tempering [sic] diagrams.

The tests performed were further brought to light during the deposition of Dr. Skleriute. *See* Skleriute Deposition at 31–43. Specifically, Dr. Skleriute testified that she visually compared and then measured the Mexican and American products. She also compared the material description contained on the boxes of the pantyhose. Skleriute Deposition at 31–42. Wear tests and stretching tests (evaluation of "stretchability, elasticity recovery, compression modulus or tightness modulus") were also conducted by Dr. Skleriute. Skleriute Deposition at 43, 153. The stretch tests were completed according to the "Elastic Pantyhose Stretch Test Methods" for the Textile Institute of Lithuania which were identified as Exhibit PS–8 during Dr. Skleriute's deposition. Skleriute Deposition at 155–56.

### 3. Data relied upon

In reaching the conclusion that the pantyhose manufactured in the United States were of better quality than the pantyhose manufactured in Mexico, Dr. Skleriute relied upon the data obtained from the tests she conducted. Specifically, the summarized data is contained in the two charts included in Dr. Skleriute's report. The first chart (identified as PS–9 during Dr. Skleriute's deposition) attached to the report contains a summary of the stretching tests performed by Dr. Skleriute. Skleriute Deposition at 161–62. The second chart (identified as PS–6 during Dr. Skleriute's deposition) summarizes the results of the wear tests. Skleriute Deposition at 44–46.

### 4. Conclusion

#### a. Rule 26

 Sara Lee does not seek to exclude Dr. Skleriute's expert testimony on the basis

---

**12.** Dr. Skleriute was employed by the Institute both when Lithuania was controlled by the Soviet Union and when Lithuania became independent from the Soviet Union.

of a Rule 26 violation. Dr. Skleriute has provided a signed report with her opinion and the basis and reasons behind her testimony. *See* Skleriute Report. Further, she provides most of the underlying data that she relied on, albeit in the form of summaries. Her qualifications are established in a CV provided during her deposition. Further, additional information, including publications, was provided at her deposition. Although Dr. Skleriute has not yet provided an actual list of publications, her fee, a list of other cases in which she has appeared as an expert, and the remainder of the underlying data, which appears to have been destroyed, exclusion of testimony is too extreme of a sanction to impose for a Rule 26 violation when any prejudice to Sara Lee can be remedied by compelling LCC to provide the requisite information within twenty days.

### b. *Daubert*

Sara Lee has raised several objections to Dr. Skleriute's report under *Daubert,* namely that "the evidence and data used by Skleriute to formulate her opinions and conclusions is unreliable, her methodologies are unclear or unknown, her wear tests cannot be replicated and thus her report and testimony are likely to mislead and confuse the jury." Motion at 31. LCC, in response [13] to these objections, maintains that Dr. Skleriute thoroughly described her methodology during her deposition, that her wear tests were properly performed, and that the data underlying her conclusions is contained in the charts attached to her report. Cross-motion at 33–37.

■ The underlying theme of *Daubert* was the Supreme Court's determination that any opinion proffered by an expert be sufficiently reliable to assist the jury. 509 U.S. at 589–91, 113 S.Ct. at 2794–96. However, the court's inquiry is flexible and should take into account certain factors, such as whether the method has be subjected to peer review and whether it has been generally accepted. *Id.* at 593–94, 113 S.Ct. at 2796–97. Finally, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596, 113 S.Ct. at 2798 (citation omitted)

■ Given the methodologies employed by Dr. Skleriute and the data complied, the report and opinions rendered by Dr. Skleriute pass muster under the *Daubert* analysis. With respect to the measurement testing and the stretch testing, LCC has shown that the tests were performed in accord with the standards currently in place in Lithuania and that these standards are sufficiently reliable. The first set of tests were actual measurements of the pantyhose conducted according to the GOST [14] 8846–87 standard (Exhibit PS-4, Skleriute Deposition). The stretch tests were completed according to "Stretch Test methods for elastic hosiery" (Exhibit PS-8, Skleriute Deposition) for the Textile Institute of Lithuania which was the current method in place at the time Dr. Skleriute conducted those tests. Skleriute Deposition at 53–54. Consequently, as Dr. Skleriute's methods have been subjected to peer review and are generally accepted, the results of those tests are not likely to mislead or confuse the jury. *See Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2796–98.

Sara Lee's more vehement objections pertain to the wear tests conducted by Dr. Skleriute. Motion at 32–39. The wear tests were conducted with nine test subjects, including Dr. Skleriute, over a sixteen day period. Skleriute Deposition at 54–55. Dr. Skleriute collected data relating to the test subjects and to the tested product and re-

---

13. LCC responds first by reviewing Dr. Skleriute's qualifications and background. Cross-motion at 31–33. However, Sara Lee is not challenging this expert on the basis that she is not qualified under Rule 702, Fed.R.Evid. Therefore, whether Dr. Skleriute is qualified to render the conclusions contained in her report is not at issue.

14. The GOST International Standards were the standards governing textiles in the former Soviet Union which Lithuania still utilizes. Skleriute Deposition at 14–15; *see also* Transcript of September 25, 1997 at 45–46. Dr. Skleriute explained that Lithuania still uses the GOST standards for testing, although the standards were slowly being converted to the ISO standards. Skleriute Deposition at 14–15.

corded the summarized comments regarding the tested product. Skleriute Deposition at 56–57. She did not record the height, weight and age of each test subject, nor did she prepare and retain a written questionnaire for each test subject to complete. Skleriute Deposition at 264–65; 49–50. Instead, she verbally asked each test subject a set of questions and incorporated their answers into the summary chart. Skleriute Deposition at 49–52. Finally, Dr. Skleriute admits that her daily notes during the wear test were destroyed after she summarized her findings. Deposition at 52–56.

Sara Lee claims that these omissions have rendered the results of Dr. Skleriute's wear tests unreliable and capable of misleading the jury. Motion at 32–39. Sara Lee further claims that the absence of Dr. Skleriute's original notes from the wear tests also mandates the exclusion of her report. Motion at 37–39. Nevertheless, these omissions do not require that Dr. Skleriute's report be stricken. Dr. Skleriute did attempt to recall the height and weight of most of the nine test subjects as well as the questions she asked them. *See generally,* Skleriute Deposition. She did indicate that the "essential observations" were contained in the summary chart even though her initial noted no longer exist. Skleriute Deposition at § 5–56. It is true that Dr. Skleriute's report is lacking in certain information and supporting documentation not due to any fault of her own, but rather due to the failure of plaintiff's counsel to properly advise her of the requirements under Rule 26 and *Daubert.* Nevertheless, these omissions can be more than adequately addressed by Sara Lee through the use of its own expert to explain the inadequacies of the testing procedures, as well as through argument to the jury. *See Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. Consequently, the report and testimony of Dr. Skleriute shall be permitted to be heard and seen by the jury.

### *Nijole Rackiene*

Nijole Rackiene is the second expert proffered by LCC in the area of pantyhose quality. Ms. Rackiene submitted a two page summary of her opinion and findings and a three page document outlining the methods used for testing. Cross–Motion at Exhibit "U". Also included were a number of attachments (twenty-one charts) showing the results of the stretch tests and the color resistance tests that Ms. Rackiene performed.

### 1. Background and area of expertise

Although no formal CV appears to exist for Ms. Rackiene, the General Director and Head of the Personnel Department at the Stock Company "Koton" (hereinafter, "Koton") submitted a "Characteristics" report on Ms. Rackiene which LCC characterizes as her CV. Exhibit "E" to LCC's supplemental submission on its cross-motion, dated October 9, 1997 (hereinafter, "Rackiene CV"). Ms. Rackiene's qualifications were also addressed during her depositions. *See* Cross-motion at Exhibit "U" (hereinafter, "Rackiene Deposition").

The document purported to be Ms. Rackiene's CV states that she has been working at Koton since 1964. She began working in the "dye-finishing shop" and, in 1986, was "appointed to the position of senior engineer for technical control." Rackiene CV. Ms. Rackiene graduated from Vilnius University Kaunas Department with a degree in Industrial Economics in 1985. Rackiene CV. In 1992, Ms. Rackiene achieved the position of "head of subsidiary laboratory." Rackiene CV.

During her deposition, Ms. Rackiene elaborated upon her qualifications. She stated that she graduated from Vilnius with a degree in industrial planning and took courses in textiles. Deposition at 8–9. Her first position with Koton involved visually inspecting the pantyhose and sorting them according to quality. Deposition at 10–11. Her later positions also involved inspecting the quality of the pantyhose manufactured at Koton and supervising the laboratory. Deposition at 11–13. Ms. Rackiene supervises three technicians and a chemist who perform various quality tests on the pantyhose. Deposition at 13–15.

Ms. Rackiene stated that she had served as an expert on the subject of pantyhose on other occasions. Specifically, she assisted the police in counterfeit pantyhose investiga-

tions a number of times. Deposition at 18–19. Rather than testifying in court, Ms. Rackiene would usually prepare a report and that report would be used by the court. Deposition at 18–19.

### 2. Tests performed

Ms. Rackiene was given twenty-four pair of American pantyhose and ninety-nine pair of Mexican pantyhose to compare for quality differences. Deposition at 21. She performed three tests on the pantyhose: color-fading tests, stretch tests and wear tests. Deposition at 21–22. Ms. Rackiene testified that the methodology used was the same methodology currently approved for use at the laboratory at Koton. Deposition at 29. The methodologies for the stretch and color-fading tests were detailed in a document attached to Ms. Rackiene's report. Cross-motion at Exhibit "U" (Exhibit PNR–4 to Rackiene Deposition) (hereinafter, "Methodology").

### 3. Data relied upon

Ms. Rackiene set out the data she relied upon in forming her opinion as to the quality of the Mexican pantyhose as compared to the American pantyhose in two charts and a summary. The first set of charts contain the results of the stretch tests. Cross-motion at Exhibit "U" (Exhibit PNR–5, PNR–6, PNR–7, PNR–8 to Rackiene Deposition) (hereinafter, "stretch test results"). The second set of charts contain the results of the color-fading tests. Cross-motion at Exhibit "U" (Exhibit PNR–9 to Rackiene Deposition) (hereinafter "color test results"). The data collected from the wear tests has been summarized in a half-page report. Cross-motion at Exhibit "U" (Exhibit PNR–4 to Rackiene Deposition) (hereinafter "wear test results"). This data was further explained by Ms. Rackiene during her deposition testimony.

### 4. Conclusion

#### a. Rule 26

Sara Lee argues that LCC never produced a CV for Ms. Rackiene and that the information learned during her deposition renders her unqualified to present an opinion in the area of pantyhose quality control. Motion at 20–22. Although LCC designates the "Characteristics" document issued by Koton as Ms. Rackiene's CV, this is clearly sufficient. It is common knowledge that a CV is normally prepared by that person, not that person's employer. Thus, the document provided by LCC is not sufficient to comply with Rule 26(a)(2)(B).

Nevertheless, in her deposition, Ms. Rackiene specifically delineates the basis for her expertise. She states that she received a degree in Industrial Economics and took courses in textiles. Rackiene Deposition at 8–9. She further states that she has been working in pantyhose quality control since 1964. Rackiene Deposition at 9–11. Her first position with the company involved visually determining the quality of the pantyhose. Rackiene Deposition at 11. Her second and current positions with Koton concerned supervision over the laboratory which conducted quality control tests. Deposition at 11–13. Thus, Ms. Rackiene's experience with the quality control of pantyhose is extensive. Rule 702, Fed.R.Evid., permits a person's experience in a particular field as grounds for qualifying them to provide an opinion as an expert. *Asplundh v. Benton Harbor Engineering*, 57 F.3d 1190, 1202 (3d Cir.1995) (holding that the proposed expert need only have "some connection between the special knowledge of the witness, however acquired, and the witness' opinion regarding the disputed factual issues in the case"). Thus, although LCC has yet to provide a CV for Ms. Rackiene, it appears that, by virtue of her experience in pantyhose quality control, she is qualified to serve as an expert in this field.

Nonetheless, LCC is still charged with the duty of providing a CV for Ms. Rackiene, as well as the amount of compensation she has received and a list of all publication within the last ten years, if any. Further, although Ms. Rackiene testified that she did provide reports in a number of cases in Lithuania, those cases have not been specified by LCC. That deficiency must be corrected in order to comply with the strictures of Rule 26. All of this information shall be provided within twenty days. In the instant matter, there is

nothing in the record indicative of bad faith on the part of LCC and any resultant prejudice may be remedied by compelling LCC to provide Sara Lee with the missing information. *Cf. Bellinger v. Deere & Co.*, 881 F.Supp. 813, 817 (N.D.N.Y.1995).

■ Finally, Sara Lee urges that Ms. Rackiene is unqualified to give an opinion on the L'eggs pantyhose at issue in this case since the pantyhose manufactured by Koton do not contain spandex and the L'eggs pantyhose do contain spandex. Motion at 21–22. The essence of this argument is that Ms. Rackiene is not sufficiently familiar with pantyhose containing spandex to analyze the quality of such pantyhose. However, Sara Lee has overlooked the fact that Ms. Rackiene is being offered as an expert on the quality control of pantyhose in general. Moreover, Sara Lee has not pointed to any differences between pantyhose made with spandex and those made without spandex that would render Ms. Rackiene's experience in this field in general inapplicable to the quality testing of pantyhose containing spandex. Nor has Sara Lee explained why the current testing procedures in place at the Institute are incompatible for testing spandex pantyhose. In this court's opinion, Ms. Rackiene is qualified to render an opinion on the quality of the American and Mexican.

### . b. *Daubert*

Sara Lee attacks Ms. Rackiene's report by asserting that the information upon which she bases her opinion and the methodologies by which she reached her opinion are not reliable and urges that both the report and trial deposition testimony be deemed inadmissible at trial. Motion at 22. Sara Lee further urges that the fact that Ms. Rackiene destroyed much of the data that supports her opinion mandates the suppression of her report. Motion at 23–26. Finally, Sara Lee claims that Ms. Rackiene's methodologies are flawed and not subject to peer review and as a result, her report should be inadmissible at trial. Motion at 26–31.

■ Sara Lee's objection regarding the destroyed data underlying Ms. Rackiene's opinion can again be directly attributed to the failure of plaintiff's counsel to properly advise Ms. Rackiene of her duties pursuant to Rule 26 and *Daubert*. Regardless, Ms. Rackiene's report and trial deposition testimony will not be stricken on this basis. As with Dr. Skleriute, the summaries and other data provided by Ms. Rackiene are sufficient to allow the jury to evaluate her conclusions and opinions without being misled. As noted above, Ms. Rackiene summarized the results of all three tests and included the charts depicting the raw data from the stretch and color-fade tests. Further, counsel for Sara Lee can alert the jury of these deficiencies through the testimony of Dr. Tushar Ghosh, Sara Lee's proposed product expert, and during summation. *See Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. Consequently, defense counsel has adequate opportunity to address this issue.

■ Turning to Sara Lee's objections to the methodologies used for the stretch tests, the color-fade tests and the wear tests, the court is satisfied that the methodologies employed by Ms. Rackiene are sufficiently detailed to allow the jury to adequately assess her conclusions. With regard to the stretch tests, Ms. Rackiene sets forth the methodology she followed in both an attachment to her report and within a document entitled "Laboratory Methods and Comments Regarding Tests on Pantyhose Produced in the USA and Mexico". Cross–Motion at Exhibit "U" (Exhibit PNR–4 to Rackiene Deposition). The methodology for the color-fade tests was set out in the same manner. Additionally, Ms. Rackiene further explained her methodology for both tests during her deposition. *See* Rackiene Deposition at 51–56, 30–50. Finally, both methodologies were based upon international standards and were the standards used by Koton for all similar tests. Rackiene Deposition at 29; *see also* Cross–Motion at Exhibit "U" (Exhibit PNR–4 to Rackiene Deposition). Thus, these procedures have been subject to peer review and may be considered generally accepted. *See Daubert*, 509 U.S. at 593–95, 113 S.Ct. at 2796–98. Consequently, these methodologies are adequately set forth by Ms. Rackiene and will allow the jury to evaluate both the stretch and color-fade tests, as well as to

consider whether the methodology is "reliable" according to the strictures of *Daubert*.

The fact that Sara Lee and Dr. Ghosh disagree with the manner of testing is of no consequence. Neither the Federal Rules of Evidence nor the Supreme Court require that for expert testimony to be admissible, the parties have to agree as to the methodology. It is not uncommon that there are conflicting views of scientific theory or hypotheses. Rather, *Daubert* requires only that proposed scientific testimony be supported by "good grounds" or appropriate validation based on what is known and not on mere "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. Ms. Rackiene's methodology is well documented, making her results testable and refutable. Accordingly, both the report and the testimony of Ms. Rackiene, as it pertains to the stretch tests and the color-fade tests, shall be admissible.

The failure of Ms. Rackiene to more clearly set forth the methodology for the wear tests does cause some concern. Even so, the lack of information on the wear test participants' weight, height, activity level, and age, any other missing information, inconsistency, or other purported "flaws" in methodology should have been ripe grounds for cross-examination. Indeed, "[t]he axiom is well recognized: the reliability of evidence goes more to the weight than to the admissibility of the evidence." *United States v. Velasquez*, 64 F.3d 844, 848 (3d Cir.1995). To the extent defense counsel did not cross-examine Ms. Rackiene on these issues, Sara Lee cannot now claim prejudice. Further, Sara Lee has the opportunity to address all of these alleged deficiencies during the examination of its own product expert. *See Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. Wherefore, Ms. Rackiene's report and testimony relating to the wear tests shall also be admissible at trial.

### Dr. Eduardas–Antanas Kelbauskas

Dr. Eduardas Kelbauskas is LCC's proposed medical expert regarding the prophylactic use of pantyhose for varicose vein suf-

ferers. Dr. Kelbauskas has submitted a one page report wherein he concludes that the use of elastic pantyhose helps ameliorate problems associated with varicose veins. Cross–Motion at Exhibit "S".

### 1. Background and area of expertise

Dr. Kelbauskas graduated from the Kaunas Institute of Medicine in 1961 with the "specialty of physician." Cross-motion at Exhibit "S" (Exhibit PK–1 to Kelbauskas Deposition) (hereinafter "Kelbauskas CV")[15]. He then began working as the head of surgery at Jonava Hospital where he continued until 1968. Kelbauskas CV. During this time, he completed his doctor's thesis at Vilnius State University Faculty of Medical Sciences General Surgery Department. From 1968 to the present, Dr. Kelbauskas has been employed in the General Surgery Department at the Faculty of Medical Sciences in Kaunas Medical Academy. Dr. Kelbauskas became an associate professor in 1969 and was conferred the "highest category in the field of surgery." Dr. Kelbauskas has authored numerous publications "in the field of general surgery, cardio surgery, blood-vessel surgery and phlebology." Dr. Kelbauskas specializes in angiosurgery and phlebology, both of which involve surgery on the blood vessels and veins. Cross-motion at Exhibit "S" (hereinafter "Kelbauskas Deposition") at 12. Dr. Kelbauskas lectures medical students and belongs to several professional organizations.

### 2. Tests performed

From Dr. Kelbauskas' report, it is not clear what, if any, tests he performed in order to reach the conclusion that wearing elastic pantyhose is good for people with varicose veins. During his deposition, Dr. Kelbauskas indicated that he performed a study in the mid–1970s regarding the prophylactic effects of hosiery on varicose veins. Kelbauskas Deposition at 31; *see also* Letter, dated February 4, 1976, attached as Exhibit "PK–5" to Kelbauskas Deposition. There

---

**15.** Dr. Kelbauskas' CV suffers from the same defect as Ms. Rackiene's CV in that it was prepared by the Chief Physician of Kaunas III Clinical Hospital, rather than by Dr. Kelbauskas himself. However, in light of the conclusion reached below, this deficiency need not be corrected.

was no testimony regarding the testing procedures underlying that study, nor was a copy of the study provided to the court.

Dr. Kelbauskas obtained about ten pair of L'eggs pantyhose from LCC and instructed certain patients with symptoms from varicose veins to wear the pantyhose. Kelbauskas Deposition at 39–40. The samples that he distributed to patients were Active Support and Sheer Energy. Kelbauskas Deposition at 95–96. Dr. Kelbauskas chose those styles of L'eggs pantyhose after stretching the pantyhose. Kelbauskas Deposition at 97–98. He followed the progress of those patients while they were wearing the pantyhose and reported that their conditions had improved. Kelbauskas Deposition at 41–42. From this, Dr. Kelbauskas decided to recommend L'eggs pantyhose to his patients to wear. Kelbauskas Deposition at 44.

### 3. Data relied upon

Dr. Kelbauskas does not include the data he relied upon in his report. During his deposition, he asserts that his report was generated based upon his thirty years of experience in the field. Kelbauskas Deposition at 33–34.

### 4. Conclusion

#### a. Rule 26

Sara Lee objects to the use of Dr. Kelbauskas' report and testimony by LCC at trial.[16] Motion at 43–46. Sara Lee argues that Dr. Kelbauskas' report is based upon data not produced during discovery. Actually, LCC acknowledges that no data has been provided and provides an opinion from a Lithuanian attorney, Mr. Pukas[17], that Dr. Kelbauskas is prohibited from disclosing any patient records. Cross-motion at 43.

■■■ Dr. Kelbauskas purports to opine concerning the medical and therapeutic benefits of L'eggs Pantyhose. Dr. Kelbauskas

concedes that his conclusions are in part based on the alleged experience of a number of his patients, see Kelbauskas Deposition at 39–44, though he has not provided the underlying medical records of these patients. Rule 26(a)(2)(B) requires that an expert report contain the data or other information considered by the witness in forming the opinions. Sara Lee would clearly be prejudiced by the absence of the medical records. Without such information, the finder of fact and the opposition have no way of evaluating the strength of an expert's conclusions and opinions. Thus, Dr. Kelbauskas' testimony with respect to any alleged therapeutic effects of L'eggs pantyhose shall be excluded. *In re Orthopedic Bone Screw Products Liability Litigation,* 1996 WL 900345 at *5 (E.D.Pa.) (striking the testimony of expert physician whose opinion was based on clinical experience, when no medical records of previous patients were provided as the basis for his testimony). Unfortunately, this conclusion is warranted as it is impossible to evaluate Dr. Kelbauskas' report and testimony given the utter lack of information provided to support his opinion. For example, nothing is known about the age, weight, or primary cause of the varicose veins[18] in Dr. Kelbauskas' patients, nor is there any indication of additional medical conditions that may affect the severity of these patients varicose veins. It is virtually impossible for a jury to assess this opinion without such fundamental information underlying this opinion. While the court understands that actual patient records could not be disclosed, there is nothing of record to suggest why certain basic information relied upon by Dr. Kelbauskas could not have been produced, such as age, height, weight, diagnosis, and medical history of these patients.

#### b. *Daubert*

Sara Lee does not maintain that Dr. Kelbauskas is not qualified as an expert. In-

---

**16.** Sara Lee's objections are grounded in *Daubert,* not Rule 26. However, as these objections are also relevant under Rule 26, they will be addressed in that manner as well.

**17.** *See, supra,* for a discussion of Mr. Pukas' conclusions.

**18.** Although the "Recommendations" given by Dr. Kelbauskas to certain patients included their height and weight, there is no indication that these were the patients that Dr. Kelbauskas based his determination that L'eggs pantyhose were beneficial for varicose vein sufferers. Nevertheless, this limited information is insufficient to permit any meaningful assessment of Dr. Kelbauskas' opinion in this regard.

deed, Dr. Kelbauskas has authored numerous articles pertaining to varicose veins, some of which contain specific reference to the prophylactic effect of pantyhose on varicose veins, and has conducted research with elastic medical stockings in the mid–1970s. Kelbauskas Deposition at 13, 14, 21–22, 70–77; 92–93; 124–25. Therefore, Dr. Kelbauskas is qualified to testify as an expert with respect to the therapeutic effects of pantyhose on varicose veins, post-surgical patients, and pregnant women by virtue of his experience in this area.

However, Sara Lee's primary objection to Dr. Kelbauskas' testimony as an expert is that his conclusions and opinions are based on unreliable data. Motion at 43–46. Dr. Kelbauskas, having decided that the elasticity configuration and tension of L'eggs pantyhose, Active Support and Sheer Energy were "good" by pulling at the pantyhose (hardly a scientific test), purchased ten samples of them to test on his patients with varicose veins and on post-surgery patients. Kelbauskas Deposition at 39–42. After concluding that the pantyhose helped his patients by reducing swelling and leg pain, he began recommending the pantyhose to his certain of his other patients. Kelbauskas Deposition at 46–47. Dr. Kelbauskas testified that he and his patients were satisfied with effects of the pantyhose. Kelbauskas Deposition at 48–49. Dr. Kelbauskas further testified that in late 1995, patients began complaining about the L'eggs pantyhose; specifically, they complained that the pantyhose did not contain any elasticity or provided no pressure on the leg. Kelbauskas Deposition at 49–50. It is uncontested that the medical records of these patients are unavailable.

■ Notwithstanding that the reason for the non-production of these medical records may be valid, Sara Lee does not have the records, or even any basic information culled from those records, to examine in order to challenge and test Dr. Kelbauskas' conclusion that his patients derived therapeutic benefits from the L'eggs pantyhose. Again, as noted above, Sara Lee is not even afforded the most fundamental information about these patients, such as the cause of their medical condition, the severity of their condition or

their basic medical history. Additionally, even if the medical records were produced, Dr. Kelbauskas has not indicated what methodology was utilized in arriving at his conclusion. Thus, the accuracy of this particular witness' hypothesis cannot be refuted or tested. *See Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2796–98. Moreover, as noted by Sara Lee, the use of the pantyhose by fifty patients may not be an adequate sampling; consequently, the potential rate of error is significant and there were no standards controlling the technique's operation. Finally, Dr. Kelbauskas admitted that he did not have any "technical engineering abilities" to check the tension or elasticity of the L'eggs pantyhose. Kelbauskas Deposition at 40–41. For these reasons, Dr. Kelbauskas' proposed testimony as an expert on the therapeutic benefits of L'eggs pantyhose is inadmissible and his report and testimony are hereby stricken.

### Dr. Bernard Miller

Dr. Bernard Miller, LCC's proposed product expert, submitted a report dated August 14, 1997. Motion at Exhibit 3 (hereinafter, "Miller Report"). The report is twenty-four pages in length with twenty-eight attachments. He reviewed nineteen documents (list attached as Exhibit "B" to Miller Report), including the deposition transcripts of various witnesses. Dr. Miller concludes that the pantyhose manufactured in Mexico are defective and not fit for sale. Miller Report at 22–24.

### 1. Background and area of expertise

Dr. Miller is currently employed as a Research Associate at TRI Princeton. Exhibit "A" to Miller Report (hereinafter, "Miller CV"). He has been continuously employed with this company in various capacities, including Vice President of Research and Associate Director of Research, since 1966. Miller CV at 1. Between 1949 and 1959, Dr. Miller was employed as a chemist with various companies, including as a polymer research chemist for E.I. du Pont de Nemours & Co. and as a analytical chemist for Hoffman La Roche. Miller CV at 2.

Dr. Miller received a Bachelor of Science degree in Chemistry from Virginia Polytechnic Institute in 1948 and a Masters of Science degree in Chemistry from the same institution in 1949. Dr. Miller received a Ph.D. in Chemistry from McGill University in 1955. Miller CV at 1. He belongs to numerous professional associations, has been affiliated with several research projects and has received many professional awards. Miller CV at 2–3. Dr. Miller has authored or co-authored more than one hundred and fifty (150) publications throughout his career. Miller CV at 4–16.

## 2. Tests performed

In order to determine whether the Mexican and U.S. pantyhose were "exactly the same", Dr. Miller compared "the product specification sheets for the corresponding Mexican and U.S. pantyhose" (Miller Report at 4–6); performed a stretch test (ASTM method D–4964–96) on the elastic waistbands to determine elastic response (Miller Report at 6–7;); compared the fiber content of the Mexican and U.S. pantyhose (Miller Report at 8–9); compared the weight of the Mexican and U.S. pantyhose (Miller Report at 9); measured the color variation between the Mexican and U.S. pantyhose by using the "X–Rite sphere Spectrophotometer Model SP78" (Miller Report at 9); and identified whether both the Mexican and U.S. pantyhose contained labels (Miller Report at 9–10).

Dr. Miller also performed and reviewed various tests in making his conclusion that the Mexican pantyhose are defective. Specifically, he reviewed the waistband elastic response test (see above); analyzed label placement and logo; reviewed the color variation test results (see above); and reviewed cross stretch tests performed by David Young (a Sara Lee employee); reviewed a test to determine yarn defects conducted by the Grundy Textile Product Laboratory using a Scanning Electron Microscope to view the pantyhose samples; "hand" variation examination; and panty and leg length measurements. Miller Report 10–17.

## 3. Data relied upon

In generating his report, Dr. Miller relied substantially upon the results of the tests set forth above. Dr. Miller also sets forth the documents he reviewed in Exhibit "B" to his report, which include the depositions (and exhibits) of Dr. Ghosh, Julius Hyman (former LCC expert), Joe Williams (Sara Lee Quality Control Director), David Young (Sara Lee Quality Control Manager), Herve Roche (former President, Sara Lee Hosiery Mexico), David Tumey (Sara Lee Product Development Product Manager), Bob Davis (for Product Development Manager for L'eggs products), Dale Segraves (Executive Director, New Product Development), Miguel A. Pena (Sara Lee Hosiery Mexico Quality Control Manager), and Ruben Martinez Mateos (former Sara Lee Hosiery Mexico Marketing Manager). Dr. Miller also reviewed the Complaint and Amended Complaint filed by LCC, the answer, counterclaim and third party complaint filed by Sara Lee and the answer to the counterclaim and third party complaint filed by LCC, as well as articles written by Dr. Zimmerman and Dr. Ghosh. Dr. Miller considered the reports and underlying documentation of Dr. Skleriute and Ms. Rackiene, as well as their depositions, and determined that those reports "were based on proper scientific methodologies and their results and conclusions are reliable." Miller Report at 17–19. He further reviewed the report of Dr. Ghosh and concluded that [t]he tests performed by and for Ghosh have been misinterpreted by him and support LCC's claims. Miller Report at 19–21.

## 4. Conclusions

### a. Rule 26

Sara Lee challenges the admissibility of Dr. Miller's report and testimony at trial based upon *Daubert*, Rule 26(a)(2)(B) and Rule 702, Fed.R.Evid. Motion [19] at 1. Apparently, Sara Lee's Rule 26 objections to Dr. Miller involve his qualifications to render a report comparing the quality of pantyhose. Those objections shall be addressed below.

**19.** As noted above, Sara Lee has filed a separate Motion *In Limine* to strike Dr. Miller. All citations to the motion in this section (discussing Dr. Miller) refer to Sara Lee's Motion *In Limine* to strike the report and testimony of Dr. Miller filed on October 1, 1997.

It should be noted, however, that it does not appear that Dr. Miller has provided a list of cases in which he testified as an expert within the last four years. Dr. Miller shall provide this information within twenty days.

### b. *Daubert*

As noted above, Sara Lee's first objection to the report and testimony of Dr. Miller is that he is not qualified to serve as an expert in the "manufacture, testing or quality control of pantyhose" or render an opinion in that regard. Motion at 12–14. Dr. Miller's education and professional background have been previously set forth and need not be reiterated here. Nevertheless, as is demonstrated by his CV, Dr. Miller has an extensive background as a chemist in the area of polymers and fibers. In his report, Dr. Miller states his qualifications to render such a report.

> I have previously tested pantyhose in connection with a confidential study on run resistance. In 1977 I was the recipient of a medal from the American Society of Testing and Materials for the development of textile industry testing methodologies. Accordingly, in light of my background and experience (EXHIBIT A) I am qualified to render this report.

Miller Report at 4. Sara Lee concedes that Dr. Miller "may qualify as an expert in some area of textiles" which is clear from his background and experience. Motion at 12.

Whether or not an individual is qualified to serve as an expert in the field in which they are being offered is the first factor a court must consider. *Kannankeril v. Terminix International, Inc.*, 128 F.3d 802, 806–07 (3d Cir.1997). The Third Circuit has stated that "exclusion [is] not the proper remedy 'simply because the experts [do] not have the degree or training which the district court apparently thought would be most appropriate.'" *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 741 (quoting *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 855 (3d Cir.1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991)). The court further explained that Rule 702's requirement that an expert be sufficiently qualified is to be liberally con-

strued and may be "satisfied with more generalized qualifications." *Id.* Nevertheless, the reliability of a report authored by an expert with "generalized qualifications" may be affected. *Id.*

In light of the above discussion, the court concludes that Dr. Miller is qualified to render his opinion as to the manufacture, testing and quality control of pantyhose. As Sara Lee concedes, Dr. Miller is qualified to render an opinion of the sort expressed in his report in the general field of textiles. Although he does not specialize in the testing and quality control of pantyhose, that is not a requirement under Rule 702 given Dr. Miller's general background in textiles. *See In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 741. Instead, Dr. Miller's limited experience in the area of pantyhose manufacture, testing and quality control is a factor that the court will take into account in determining the reliability of Dr. Miller's report, as that is another challenge by Sara Lee. *See id.* at 742. This is in accord with the Third Circuit's mandate that the requirements of Rule 702 be liberally construed.

Sara Lee's second attack on Dr. Miller is that his opinion that the entire lot of Mexican pantyhose were defective is unsupported by his own test results. Motion at 14–22. The gravamen of Sara Lee's argument is that Dr. Miller's tests do not prove that the *entire lot* of Mexican pantyhose are defective. *See* Motion at 15–20 (emphasis added). Rather, Sara Lee asserts that Dr. Miller's "non-standard elasticity test" and his "other non-standard irrelevant test" to determining sizing could only possibly prove that some of the Mexican pantyhose are defective. *Id.* Further, Sara Lee asserts that Dr. Miller has not adequately explained how the alleged differences highlighted by his tests prove that any of the Mexican pantyhose were defective. *Id.* These are not proper objections under *Daubert*. Other than asserting that the tests performed by Dr. Miller are irrelevant and non-standard, Sara Lee does not demonstrate how these tests are unscientific or not have not been subject to peer review. Nor does Sara Lee complain

that Dr. Miller has not properly set forth his test methodology and resultant data.

Dr. Miller adequately articulates the methodologies employed in reaching his conclusions and opinions regarding the Mexican pantyhose. Dr. Miller sets forth the standards he followed in conducting his tests and includes the data gathered as a result of those tests in his report. He conducted the test for waistband elastic force measurements pursuant to the test standards recommended by the American Society of Testing and Materials. Miller Report at 6. Further, he explains the results of the tests performed and why those results led him to conclude that the Mexican pantyhose are defective. In short, Dr. Miller's report is acceptable and will not serve to confuse or mislead the jury.

Sara Lee also complains that Dr. Miller has no scientific basis underlying his determination that the absence of a label in the Mexican pantyhose renders those pantyhose defective. However, Sara Lee overlooks the fact that one of the opinions Dr. Miller was retained to give was with regard to the differences in the American pantyhose and the Mexican pantyhose. *See* Miller Report at 1. This opinion is in response to an alleged representation by a Sara Lee agent that the Mexican and American pantyhose were exactly the same. Miller Report at 1–2. In this case, it seems that one of the differences is the lack of a label in the Mexican pantyhose. From this, Dr. Miller concludes that the Mexican pantyhose are not exactly the same as the American pantyhose, contrary to alleged representations by Sara Lee. Miller Report at 9–11. Additionally, this issue was addressed by Dr. Miller in light of the standards set forth by Sara Lee in its L'eggs Quality Manual. Miller Report at 11. Accordingly, although Dr. Miller's assessment of the absence of a label is not necessarily scientific in nature, it will not confuse or mislead the jury because it is merely a determination that the Mexican pantyhose are different from the American pantyhose. Moreover, Sara Lee is free to challenge Dr. Miller's conclusion in this regard during cross-examination.

Lastly, Sara Lee's argument that Dr. Miller's test results do not support his conclusion that the entire lot of Mexican pantyhose are defective is more properly addressed through the testimony of Dr. Ghosh and through the cross-examination of Dr. Miller at trial, rather than by the exclusion of Dr. Miller's report. *See Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. That Dr. Miller did not perform a wear test is another topic that is more appropriately examined during the testimony of Dr. Ghosh and the cross-examination of Dr. Miller. Consequently, the report of Dr. Miller shall not be excluded and his testimony as an expert shall be permitted at trial.

To the extent, however, that Dr. Miller comments on the conclusions of Dr. Skleriute and Ms. Rackiene, those portions of his report shall be stricken. Although Rule 705, Fed.R.Evid., permits an expert to render an opinion on the ultimate issue of a case, that is not what LCC is attempting to do here. Instead, LCC attempts to bootstrap the reliability of its experts, Dr. Skleriute and Ms. Rackiene, through the use of another expert. This attempt to analyze and give weight to the opinions of Dr. Skleriute and Ms. Rackiene is impermissible and is properly left for the jury. *See United States v. Rockwell*, 781 F.2d 985, 990 (3d Cir.1986) ("'It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts.'") (citation omitted). Further, this is not a proper subject for an expert opinion since the jury is able to perform this function adequately and does not need the assistance of an expert. *See* Rule 701, Fed.R.Evid.

## V. LCC'S CROSS–MOTION THAT SARA LEE HAS WAIVED OBJECTIONS

LCC contends that there has been a waiver of all objections to the testimony of the three experts whose trial testimony has been taken and preserved on videotape—Nijole Rackiene, Dr. Elona Skleriute, and Dr. Eduardas Kelbauskas. These witnesses were deposed on February 6, 1997, February 4–5, 1997 and February 3–4, 1997, respectively. LCC's supplemental submission on its cross-motion, dated October 9, 1997, at 1–2. Sara

Lee asserts that it informed LCC that it was "concern[ed] about the qualifications and opinions of those experts, and made it clear that it would be raising those issues with the Court later." Sara Lee's Supplemental Memorandum in support of its motion *in limine*, dated October 9, 1997, at 10 n. 3. LCC maintains that this was improper and constituted a waiver of Sara Lee's right to object to these experts at this time. *See* Cross-motion.

LCC relies on New Jersey Court Rule 4:14–9(f) as support for its cross-motion. Cross-motion at 14–18. LCC. correctly claims that, pursuant to Rule 83.3, Local Civil Rules for the District of New Jersey (hereinafter, "Local Rules") (then General Rule 44), and the comments thereto, the court is permitted to consider "procedure and practice of the Courts of the State of New Jersey ... **for guidance.**" Local Rule 83.3 (emphasis added). Cross-motion at 15. The comments to Local Rule 83.3 indicate that "most videotaped depositions in the federal court are taken using the procedures outlined in New Jersey Court Rule 4:14–9." LITE, N.J. FEDERAL PRACTICE RULES, Comment Rule 44, (GANN).

■ Nonetheless, it is necessary to read the beginning portion of Local Rule 83.3, which provides:

> In the absence of any governing rule and/or if no procedure is especially prescribed, the Court and parties shall proceed in any lawful manner not inconsistent with the Constitution of the United States, the Federal Rules of Civil and Criminal Procedure, these Rules, or any applicable statute with the aims of securing a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay and of avoiding surprise and injustice.

Further, Rule 32(b), Fed.R.Civ.P., expressly provides that objections to any deposition may be made at trial. While Rule 32, Fed.R.Civ.P., does not specifically apply to videotaped depositions, it does apply to depositions generally. Inasmuch as New Jersey Court Rule 4:14–9(f) is inconsistent with Rule 32(b), Fed.R.Civ.P., it will not be followed. Thus, LCC's argument that Sara Lee has waived any objections to the testimony of Nijole Rackiene, Dr. Elona Skleriute, and Dr. Eduardas Kelbauskas is unsupported. Consequently, Sara Lee is not barred from objecting to the testimony of the witnesses proffered by the plaintiffs as experts in this action, as their objections were not waived under Rule 32(b), Fed.R.Civ.P.

## VI. *SARA LEE'S MOTION IN LIMINE TO EXCLUDE FROM TRIAL ANY TESTIMONY AND EVIDENCE RELATED TO AN ALLEGED INFILTRATION INTO LITHUANIA OF L'EGGS BRAND PANTYHOSE DONATED TO RUSSIAN CHARITIES*

Sara Lee contends, pursuant to Rules 402 and 403, Fed.R.Evid., that LCC should be precluded from admitting any evidence of the alleged infiltration into Lithuania of the L'eggs pantyhose donated to charities located in Russia. Sara Lee raises several arguments in this regard. First, Sara Lee asserts that LCC has not raised this claim in either the Complaint or the Amended Complaint and it is therefore irrelevant under Rule 402, Fed.R.Evid. Motion at 3–4. Second, Sara Lee avers that discovery has not yielded any evidence relating to the alleged black market infiltration of the donated pantyhose into Lithuania other than the deposition of Algis Vasys. Motion at 4–6. Thus, Sara Lee claims that since LCC has not shown any support for this issue and has not set forth this claim in the complaint, it would be unfairly prejudiced by the admission of such evidence.

In contrast, LCC claims that there is a substantial amount of evidence, much of it from officers of Sara Lee, regarding the infiltration of donated pantyhose into Lithuania. Opposition at 2–8. Further, LCC sets forth the facts that Mr. Vasys and Laima Zajanckauskiene, both from LCC, will testify regarding this issue. Opposition at 8–12. LCC enumerates the counts of the complaint and the portions of the Joint Final Pretrial Order that refer to the Russian donation and the effect it had on LCC. Opposition at 13–14. In addition, LCC counters that many of the statements made and documents written by employees of Sara Lee constitute admissions

by a party-opponent pursuant to Rule 801, Fed. R. Evid, that are admissible against Sara Lee as evidence of the infiltration. Opposition at 14–16. Finally, LCC disagrees that evidence of the infiltration of the donated pantyhose is either irrelevant or highly prejudicial. Opposition at 16–19.

Rule 402, Fed.R.Evid., provides that all relevant evidence is admissible unless otherwise deemed inadmissible by federal law. Rule 403, Fed.R.Evid., permits a court to balance the probative value of certain relevant evidence and determine whether the danger of unfair prejudice warrants the exclusion of that evidence. Thus, any inquiry in this area begins with a determination of relevance.

■ It is clear that the alleged infiltration of donated pantyhose from Russia into Lithuania was the alleged impetus of this entire case. LCC essentially claims that, had the donation never occurred, Sara Lee would not have given LCC the Mexican pantyhose and that the Lithuania retailers would never have been dissatisfied with LCC's product. See Joint Final Pretrial Order at 27–57. Accordingly, the relevance of this evidence is clear. The issue of infiltration has existed from the beginning and to prevent LCC from presenting any evidence in this regard would severely limit LCC's ability to litigate this case. On the contrary, there is not a serious danger that this evidence would unfairly prejudice Sara Lee. This issue appears in the Complaint filed by LCC (¶¶ 24–34) and has remained an issue throughout discovery. Moreover, these allegations are not such that Sara Lee will be prejudiced. Further, the probative value of this evidence outweighs any possible prejudice to Sara Lee. Rule 403, Fed.R.Evid. Consequently, LCC will not be barred from presenting evidence on this issue so long as that evidence is consistent with the Federal Rules of Evidence.

### VII. LCC'S MOTION IN LIMINE TO LIMIT THE SCOPE OF DEFENDANTS' EXPERT REPORTS

LCC moves to limit the scope of Sara Lee's expert report written by Dr. Ghosh and to exclude any reference to any tests performed by Julius Hyman (LCC's former product expert) or the data that resulted therefrom based on the doctrine of judicial estoppel. Motion at 2–5. LCC further argues that allowing Dr. Ghosh to rely on such information would unfairly prejudice LCC since it was not contained in the report of LCC's product expert, Dr. Miller, and because reference to LCC's former product expert may lead the jury to believe that the plaintiff has been shopping for experts. Motion at 5–7. Indeed, expert shopping is precisely what plaintiff's counsel has done. Finally, LCC urges that Dr. Ghosh's reliance on certain information produced by Julius Hyman in effect makes Mr. Hyman an expert against LCC. Motion at 7–8.

For the reasons noted in the Honorable Stephen M. Orlofsky's opinion of November 26, 1997, this motion is dismissed as moot. See Opinion entered on November 26, 1997 at 19–20 n. 4.

### VIII. LCC'S MOTION IN LIMINE TO LIMIT THE TESTIMONY OF VARIOUS SARA LEE WITNESSES

LCC also moves to limit the testimony of Peter Hellebush, Brad Walker, Karen Bartolletti, Herve Roche, and Karen Lefler. Motion at 2–3. LCC contends that all of these witnesses were identified, for the first time, in the Joint Final Pretrial Order as having knowledge of certain facts relevant to Sara Lee's counterclaim and third-party complaint and failure to disclose this knowledge previously mandates the requested relief pursuant to Rule 26 and Rule 37, Fed. R.Civ.P.

In contrast, Sara Lee claims that it was in compliance with Rule 26 in that it identified the general areas about which each witness was expected to testify prior to LCC commencing depositions of various Sara Lee witnesses. Opposition at 17–21. Sara Lee further maintains that, should this court accept the contention of LCC that it failed to specifically disclose certain topics, that failure was harmless in light of the specific allegations set forth in the counterclaim and third-party complaint. Opposition at 21–22.

■ LCC charges that Sara Lee has violated its obligations under Rule 26, Fed. R.Civ.P., which provides in pertinent part:

Except to the extent otherwise stipulated or·directed by order or local rule, a party shall, without awaiting a discovery request, provide to other parties: (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with·particularity in the pleadings, identifying the subjects of the information[.]

Rule 26(a)(1)(A). As there is no question that these witnesses were identified, this particular dispute hinge son the degree of specificity required when disclosing information under this rule. The Advisory Committee notes are instructive on this issue. When discussing the revision of Rule 26 that first required initial disclosures, the Advisory Committee made the following comment: "Indicating briefly the general topics on which such persons have information should not be burdensome, and will assist other parties in deciding which depositions will actually be needed." Advisory Committee Notes to the 1993 amendments. Hence, contrary to LCC's argument, it appears that a party is in compliance with Rule 26 even when the disclosure is only general in nature. *See id.*

■ Turning to the disclosures made by Sara Lee, there is no question that the disclosures in the Final Pretrial Order are more specific than previous disclosures made by Sara Lee. *See* Motion at 4–7. However, contrary to LCC's contention, these more specific disclosures are not "totally new areas of testimony that Sara Lee seeks to present in Court...." Motion at 3. Instead, it appears that Sara Lee has further elaborated on the areas about which these witnesses are going to testify. Sara Lee's initial and supplemental disclosures regarding these witnesses are consistent with Rule 26 in that they identify the subjects of the information about which each witness may have knowledge. Nowhere in the rule or in the Advisory Committee comments to the rule states that a party is precluded from having a witness testify on a subject not identified in

disclosures under Rule 26(a)(1)(A). Finally, all of the subjects that are listed for these witnesses should have been anticipated given the allegations contained in Sara Lee's counterclaim and third-party complaint. Accordingly, the witnesses identified by LCC will not be limited in their testimony at trial as LCC was on sufficient notice of the general areas about which they would testify and had an adequate opportunity to depose these witnesses on matters relevant to the counterclaim and third-party complaint.

■ Even assuming that the disclosures made by Sara Lee were insufficient, there is no allegation of bad faith. Thus, the exclusion of certain aspects of these witnesses testimony is an especially harsh remedy. Though the court has broad discretion to sanction litigants for violations of the discovery rules, any sanction should be commensurate with the violation. *See Newman*, 60 F.3d at 156. The Third Circuit has recognized that striking testimony is an severe sanction that should be used sparingly. *See ABB Air Preheater Inc.*, 167 F.R.D. at 673. Even so, LCC urges that the appropriate remedy is for the court to limit the subjects about which those witnesses will testify. LCC posits that reopening discovery would be prejudicial for two reasons: the probable adjournment of the trial date and increased costs of the further depositions. Motion at 11. The court concludes that any claims of prejudice are alleviated by allowing LCC to depose the challenged witnesses and not be limiting the testimony of these witnesses, particularly when it is clear that this case will not be tried for several more months.

## IX. *CONCLUSION*

The court must express its astonishment with the selection and preparation of plaintiff's putative expert witnesses. In a case where the plaintiff is seeking well in excess of one million dollars in damages, it is' odd that counsel has designated several expert witnesses from Lithuania whose presence in an American court has necessarily caused excessive costs and complications. More shocking, however, is plaintiff's counsel's complete failure to properly advise these witnesses as to basic requirements of expert

reports and testimony in American courts. This failure has unnecessarily complicated an already complex case.

For the foregoing reasons, Sara Lee's motion *in limine* to bar the reports and/or testimony of various LCC experts shall be granted in part and denied in part. LCC's cross-motion that Sara Lee has waived any objections with regard to these witnesses shall be denied. Sara Lee's motion *in limine* to bar the report and testimony of Dr. Bernard Miller shall be granted in part and denied in part. Sara Lee's motion *in limine* to exclude from trial any evidence relating to the alleged infiltration of donated pantyhose from Russia to Lithuania shall be denied. LCC's motion *in limine* to limit the scope of Sara Lee expert Dr. Ghosh shall be dismissed as moot. LCC's motion *in limine* to limit the testimony of various Sara Lee witnesses shall be denied.

